FILED
US DISTRICT COURT
WESTERN DISTRICT
OF ARKANSAS

Aug 30, 2024

OFFICE OF THE CLERK

# UNITED STATES DISTRICT COURT

### for the

Western District of Arkansas

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>**3519 North 27th Street<br>Fort Smith, Arkansas, 72904** | )<br>)<br>)<br>)<br>)<br>) |

Case No.  2:24-cm-00058

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

**See Attachment A**

located in the _____ **Western** _____ District of _____ **Arkansas** _____ , there is now concealed *(identify the person or describe the property to be seized)*:
**See Attachment B**

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21, USC, Section 841 (a)(1) | Possession with intent to distribute a controlled substance |
| 21, USC, Section 846 | Conspiracy |

The application is based on these facts:
**See attached affidavit**

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested
under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Jerred Rankin*
*Applicant's signature*

**Jerred Rankin, DEA TFO**
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____ **08/30/2024** _____

*Mark E. Ford*
*Judge's signature*

City and state:  **Fort Smith, Arkansas**

**Mark E. Ford, US Magistrate Judge**
*Printed name and title*

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

**INTRODUCTION AND AGENT BACKGROUND**

I, Jerred Rankin, Task Force Officer ("TFO") with the Drug Enforcement Administration ("DEA"), being duly sworn, depose and state that:

1.      I am a Task Force Officer with the DEA, United States Department of Justice, currently assigned to the New Orleans Field Division/Fayetteville Resident Office of DEA, High Intensity Drug Trafficking Area ("HIDTA").  I have been assigned as a DEA Task Force Officer for approximately three years and have been employed as an officer for the Rogers Police Department for twelve years.  I have participated in numerous investigations involving drug trafficking violations, including, but not limited to, the distribution, importation, manufacturing, and possession with the intent to distribute of illegal controlled substances, and conspiracy to commit the same, as well as the use of communication facilities, such as telephones, digital telephone pagers, and other like facilities, to facilitate drug law violations, and, finally, controlled substance investigations that include the laundering of the proceeds of the unlawful distribution, or money laundering and conspiracy to commit the same.

2.      This affidavit is made in support of an application to search the property located at 3519 North 27th Street, Fort Smith, Arkansas, 72904 (subject premises), for the fruits, evidence, and instrumentalities of violations of Title 21, United States Code, Section 841(a)(1) (distribution and possession with intent to distribute a controlled substance) and Title 21, United States Code, Section 846 (conspiracy to commit controlled substance offense).  I further submit that a search of the premises will result in the discovery of items that constitute evidence, fruits, and instrumentalities of such criminal activity.

3.    Based upon your affiant's training, experience, shared experience with other agents and officers with whom he has worked, and participation in other investigations involving large amounts of fentanyl, methamphetamine, cocaine, heroin, marijuana and/or other controlled substances, your affiant knows the following to be true:

a.  That narcotics traffickers often purchase and/or title their assets in fictitious names, aliases or the names of relatives, associates or business entities to avoid detection of these assets by law enforcement authorities;

b.  That even though these assets are in names other than the narcotics traffickers, the narcotics traffickers actually own and continue to use these assets, and exercise dominion and control over them;

c.  That narcotics traffickers must have access to large amounts of United States currency in order to maintain and finance their on-going narcotics business;

d.  That it is common for narcotics traffickers to maintain books, records, receipts, notes, ledgers, airline tickets, receipts relating to the purchase of financial instruments and/or the transfer of funds, and other papers relating to the transportation, ordering, sale and distribution of controlled substances.  That the aforementioned books, records, receipts, notes, ledgers, etc., are maintained where the traffickers have ready access to them;

e.  That it is common for drug dealers to store contraband, proceeds of drug sales, and records of drug transactions in secure locations within their residences, their businesses, their vehicles, and/or other locations which they maintain dominion and control over for ready access, and to conceal these items from law enforcement authorities;

f.  That in order to accomplish this concealment, narcotics traffickers frequently build "stash" places within their residences, vehicles, or businesses. There are a number of

publications available instructing where and how to build "stash" places. Copies of these types of publications have been found in the residences of narcotics traffickers;

g.  That it is common for persons involved in narcotics trafficking to maintain evidence pertaining to their obtaining, secreting, transfer, concealment, and/or expenditure of narcotics proceeds, such as: currency, financial instruments, precious metals, and gemstones, jewelry, books, records, invoices, receipts, records of real estate transactions, bank statements, and related records, passbooks, money drafts, letters of credit, money orders, bank drafts, cashier's checks, bank checks, safe deposit box keys, and money wrappers. These items are maintained by the narcotics traffickers within their residences, vehicles, businesses or other locations, which they maintain dominion and control over;

h.  That narcotics traffickers often utilize electronic equipment such as cell phones, SIM cards, computers, flash drives, external hard drives, multimedia devices, telex machines, facsimile machines, currency counting machines, and telephone answering machines to generate, transfer, count, record and/or store the information described in items a, b, d, e, and g above, and q and r below;

i.  That when drug traffickers amass large proceeds from the sale of drugs, the drug traffickers may attempt to legitimize these profits through various money laundering methods.  To accomplish these goals, drug traffickers utilize, including but not limited to, domestic and international banks and their attendant services, securities brokers, professionals such as attorneys and accountants, casinos, real estate, shell corporations, business fronts, and otherwise legitimate businesses which generate large quantities of currency;

j.  That the sale of fentanyl, methamphetamine, cocaine, heroin, marijuana and other Controlled Dangerous Substances generates large quantities of United States currency in small denominations (commonly referred to as "street money");

k.  That it is common for drug dealers to physically handle and count the "street money" after receiving it in exchange for the Controlled Dangerous Substances, thereby leaving residue traces of Controlled Dangerous Substances on the "street money." Law enforcement agencies utilize dogs which are trained to react to the odor of Controlled Dangerous Substances and residue traces of Controlled Dangerous Substances; and that those trained dogs have reacted to narcotics tainted currency negotiated at banks and concealed in the residences of narcotics traffickers;

l.  That it is common for drug dealers to separate their "street money" by denomination and put this currency in rubber banded stacks in varying increments to facilitate quick counting;

m.  That it is recognized and Courts have held that the small and medium denominations of questionable currency, along with the manner in which the currency is handled, carried and concealed may establish probable cause that there is a substantial connection between the questionable currency and narcotics transactions, i.e. proceeds of illegal narcotic sales;

n.  That the Currency Transaction Report (CTR) (IRS Form 4789), which is required to be completed and filed with the IRS by all financial institutions on every currency transaction which exceeds $10,000, causes tremendous problems for narcotics traffickers when they attempt to negotiate their illegal profits at financial institutions;

o.  That, in order to avoid the filing of a Currency Transaction Report, narcotics traffickers often "structure" their currency transactions so that no one transaction exceeds $10,000, or they provide false or misleading information in an attempt to legitimize or conceal the source and/or ownership of the currency;

p.  That narcotics traffickers at times become fearful that their extravagant spending habits will bring them under scrutiny by the Internal Revenue Service or other federal, state, or local agencies.  In order to legitimize their spending, these traffickers file tax returns reporting income commensurate with the amount of money they have spent during the year, which they feel, can be traced and documented by the government.  The "source" of their income reported on these returns is usually falsely stated, misleading or generic in terms.  Retained copies of these returns are commonly kept by the traffickers in their residences and businesses;

q.  That traffickers of controlled substances commonly maintain addresses or telephone numbers in books or papers which reflect names, addresses and/or telephone numbers of their associates in the trafficking organization;

r.  That drug traffickers take or cause to be taken photographs of themselves, their associates, their property and their product. That these traffickers usually maintain these photographs in their possession, or in their residences and/or vehicles;

s.  That the courts have recognized that unexplained wealth is probative evidence of crimes motivated by greed, in particular, trafficking in controlled substances;

t.  That drug traffickers commonly have in their possession, that is, on their person, at their residences, in their vehicles, and/or their businesses, firearms, including but not limited to: handguns, pistols, revolvers, rifles, shotguns, machine guns and other weapons.  Said

firearms are used to protect and secure a drug trafficker's property, and they will often utilize counter surveillance equipment in an effort to alert them if law enforcement or other unwanted visitor(s) are on the premises. Such property may include, but is not limited to: narcotics, jewelry, vehicles, narcotics paraphernalia, books, records, and United States currency;

u.  That the target(s) of this investigation are engaged in long-term, continuing criminal activities, namely offenses involving the distribution and possession with intent to distribute controlled substances, in violation of Title 21, United States Code, Section 841(a)(1), and conspiracy to commit the aforementioned crimes, in violation of Title 21, United States Code, Section 846;

v.  That the evidence sought through the use of the search warrant listed herein will provide investigators with admissible evidence of these crimes needed to establish the full scope and nature of the offenses being investigated; including determining the identity of members of the organization, the sources of supply, transportation methods, locations used to conceal drugs and the assets purchased from the proceeds derived from the sale of drugs; and,

w.  That there is probable cause to believe that such items of evidence, which represent the fruits and instrumentalities of said offenses, will be located within the locations specified in this application, which is located within the Western District of Arkansas.

4.    In addition, I know, based on my experience and training, that narcotics traffickers use cellular telephones and electronic devices to store, conceal, and record information that pertains to their narcotics distribution, including but not limited to: photographs and videos of the controlled substances they distribute; photographs of related paraphernalia:

photographs of the proceeds of distribution; photographs of weapons used to protect said product and proceeds; call lists; and contact information for buyers, sellers and other co-conspirators; and information concerning financial institutions or services used to store, conceal, or transfer the proceeds of distribution.  In addition, based on my training and experience, I know that these same cell phones are also used by individuals involved in drug trafficking to send emails, text messages, communications in messenger applications that are tied to social media accounts like Instagram, Snapchat, Cash App and Facebook, all for the purpose of facilitating drug transactions and/or the collection of proceeds. As detailed in this affidavit, Salvador Caracena-Zarates utilizes his telephone to further his narcotics trafficking activities in these exact ways.

5.      The information contained in this affidavit is based upon information provided by other DEA special agents, other federal, state and local law enforcement officers, public source documents, court-authorized intercepts, and my own personal investigation. All the information provided by confidential sources (CS) has been corroborated by other investigative means during the course of the investigation through physical and electronic surveillance, the arrests of linear individuals, the collection and analysis of evidence, and checks of various financial, property, and criminal databases.

6.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all my knowledge about this investigation. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## PREMISES TO BE SEARCHED

7.      The Subject Premises to be searched is located at 3519 North 27th Street, Fort Smith, Arkansas, 72904, in Sebastian County.  The Subject Premises is a one-story family home with yellow siding and white trim on the house, and a white front door. The house number "3519" is attached to the porch visible from the road.  The Subject Premises faces east and is the sixth residence on the west side of 27th Street from the intersection of Spradling Avenue. Based on the investigation so far, the Subject Premises has been identified as a residence used by Salvador Caracena-Zarates, and is further described in Attachment A.

## PROBABLE CAUSE

8.      Beginning in January 2024, the DEA has been investigating the drug trafficking activities of Salvador Caracena-Zarates and other members of a drug trafficking organization (DTO). Through a series of controlled purchases of fentanyl, telephone toll analysis, surveillance, and court-authorized Title-III wire and electronic interceptions to and from telephones utilized by members of this drug trafficking organization, the DEA has determined that members of this drug trafficking organization are operating between Northwest Arkansas and Fort Smith, Arkansas. Through the investigation, it was uncovered that Caracena-Zarates is a source of supply (SOS) for members of the DTO.

9.      On June 20, 2024, the affiant and Detective Dalton Frazier met with a reliable, confidential source ("CS1") in reference to the drug trafficking activities of Alonzo Releford. CS1 advised Releford was distributing large amounts of fentanyl from an apartment complex located in Fayetteville, Arkansas.  On this date, CS1 conducted a controlled purchase of (12) twelve fentanyl pills from Releford.  During the controlled purchase Releford informed CS1 that he would be traveling to Fort Smith, Arkansas to replenish his supply of fentanyl pills.

10.     On June 21, 2024, DEA Fayetteville Resident Office FRO), in conjunction with the Arkansas State Police (ASP) and Fourth Judicial District Drug Task Force (4th JDDTF) conducted a joint investigation.   During the investigation on this date, DEA Fort Smith TFO Richard Proctor observed Releford's vehicle, a silver Mercury Grand Marquis displaying Arkansas License Plate AUP03P, registered to Alonzo Releford, in Fayetteville, Arkansas was parked at 3519 North 27th Street, Fort Smith, Arkansas.   TFO Proctor also observed a red Jeep Wrangler, displaying Oklahoma License Plate JJ4820, registered to Lindsey Danielle Owens, parked in front of 3519 North 27th Street, Fort Smith, Arkansas.   Caracena-Zarates has been observed through surveillance driving this jeep throughout this investigation and is believed to be his primary vehicle. Releford departed from this residence and at approximately 6:37 pm, ASP Trooper Mitch Smothers conducted a traffic stop at I-49 Northbound at Mile Marker 49 in West Fork, Arkansas on the 2001 Mercury Grand Marquis being driven by Releford.   Releford was arrested for a previous distribution charge and transported to the DEA Fayetteville Resident Office on this date.   During a search of Releford at the DEA FRO, agents located approximately 592 fentanyl pills in a plastic baggie in Releford's underwear.   Releford was booked into the Washington County Detention Center and later booked on state drug charges.   In my training, experience, and knowledge of this investigation, the affiant believes that Releford was supplied the fentanyl pills from Caracena-Zarates at 3519 North 27th Street, Fort Smith, Arkansas.

11.     On August 12, 2024, the Honorable Judge Timothy L. Brooks in the Western District of Arkansas authorized the interception of wire and electronic communications to and

from Caracena-Zarates' cellular telephone number (605) 215-3878 for a period of thirty days. Interceptions began on August 14, 2024 and remain ongoing.[1]

12.    On August 23, 2024, the affiant was contacted by a DEA confidential source ("CS2), who advised that he/she was in contact with Caracena-Zarates via Snapchat, and that Caracena-Zarates was ready to distribute fentanyl pills to CS2. Caracena-Zarates was utilizing the Snapchat moniker "Cubano Cuz," and during the conversation, Caracena-Zarates asked CS2 if he/she could "come here," which CS2 understood to mean where Caracena-Zarates was located in *Fort Smith, Arkansas*.[2] CS2 acknowledged and told Caracena-Zarates that he/she needed one hundred fentanyl pills for six hundred dollars and Caracena-Zarates, responded with "ok wya."

13.    At approximately 10:00 PM, the affiant was monitoring electronic surveillance of Caracena-Zarates' cellular telephone, and discovered he was in the area of 3519 N 27th St, Fort Smith, Arkansas.  Detectives with the Fort Smith Police Department (FSPD) Narcotics Unit established surveillance around the area of N 27th Street in Fort Smith, Arkansas and noted that another vehicle associated with Caracena-Zarates, a 2013 black Dodge Charger *displaying Arkansas license plate "ALM83V," registered to Twana Thomas and Cecil Gardner,* was parked in front of 3519 N 27th St, Fort Smith, Arkansas. FSPD Detective Richard Proctor then observed Caracena-Zarates exit the residence as Det. Proctor drove by the residence while conducting surveillance.  Caracena-Zarates was seen wearing a red shirt, blue jeans, and a hat.

---

[1] The documents for this authorization remain under seal in Case No. 5:24 CM 60.

[2] CS2 previously purchased fentanyl pills from Caracena-Zarates in Fayetteville, Arkansas.

14.     At approximately 10:30 PM, the affiant, RAC Robert Robinson, and TFO Emilio Zacarias met with CS2 at a predetermined meet location in Fort Smith, Arkansas. The affiant instructed CS2 to place a recorded phone call to Caracena-Zarates but Caracena-Zarates did not answer. At approximately 11:02 PM, CS2 received an incoming Snapchat call from Caracena-Zarates. During the phone call, Caracena-Zarates told CS2 to meet him at "North Pointe Housing Projects" and explained to CS2 that he was "down the street from there." Caracena-Zarates also stated that he needed gasoline and would talk to CS2 then.  Once the call ended, the affiant searched CS2 and CS2's vehicle for contraband, with negative results. The affiant provided CS2 with six hundred dollars of DEA Official Advanced Funds (OAF) and an audio/video recording device. The affiant briefed CS2 and told him/her to go to the area that Caracena-Zarates described and told CS2 to call Caracena-Zarates for further location information.

15.     At approximately 11:15 PM, CS2 arrived near the "North Pointe Housing Projects," where CS2 spoke with Caracena-Zarates via a Snapchat call. During the phone call, Caracena-Zarates tried to explain to the CS2 to meet on a nearby street, but CS2 was not able to understand the directions.  During the conversation, electronic surveillance showed that Caracena-Zarates was mobile and that he left 3519 N 27th St, Fort Smith, Arkansas. During the conversation, Caracena-Zarates advised that he saw CS2, and CS2 acknowledged that he/she observed Caracena-Zarates in the black Dodge Charger. Caracena-Zarates told CS2 to follow him, which CS2 did. CS2 and Caracena-Zarates maintained the Snapchat call for the duration of CS2 following Caracena-Zarates.

16.     At approximately 11:21 PM, Caracena-Zarates stopped at a nearby gas station, located at 3627 Midland Blvd., Fort Smith, Arkansas and parked at a gas pump. CS2 parked at a nearby gas pump, where Caracena-Zarates exited his Dodge Charger and walked to CS2's

vehicle. Caracena-Zarates entered CS2's vehicle and conducted the transaction in which Caracena-Zarates provided CS2 with approximately 103 fentanyl pills, in exchange for six hundred dollars of DEA OAF.

17.    CS2 left the gas station parking lot and proceeded to a predetermined meet location. The affiant, RAC Robinson, and TFO Zacarias maintained surveillance of CS2 and met with CS2. The affiant seized the purchased fentanyl pills from CS2 and the audio/video recording device, as witnessed by RAC Robinson. The affiant searched CS2 and CS2's vehicle, with negative results. During a debrief, CS2 explained that he/she met with Caracena-Zarates at the gas station, and that the fentanyl transaction occurred inside CS2's vehicle.

18.    While DEA Agents/TFOs were meeting with CS2, FSPD detectives maintained physical and electronic surveillance of Caracena-Zarates. After the transaction, detectives observed Caracena-Zarates return directly to the subject premises of 3519 N 27th St., Fort Smith, Arkansas after the transaction. Surveillance was terminated at that point.

19.    The purchased fentanyl pills were processed into DEA Evidence at the DEA Fayetteville Resident Office.  Exhibit 419 was then mailed to the DEA South Central Laboratory for further testing. Your affiant observed the fentanyl pills were blue in color, with "m" imprinted on one face, and "30" imprinted on the other face which, in my training and experience, your affiant recognized the pills appeared to fake-pressed to resemble blue oxycodone 30 MG tablets and are consistent in appearance with other fentanyl pills seized in this investigation.

20. The residence of 3519 N 27th St, Fort Smith, Arkansas has been identified as the residence of Joshua Ladd and Salvador Caracena-Zarates. Ladd's driver's license lists 3519 N 27th St, Fort Smith, Arkansas as his address. On August 17, 2024, a text message was intercepted from Ladd sent to Caracena-Zarates with the contents, "Dude can you pay the rent" which in my training, experience, and knowledge of this investigation is believed to be a reference Caracena-Zarates needing to pay rent for the residence at 3519 N 27th St, Fort Smith, Arkansas where Ladd also resides. While monitoring interceptions on Caracena-Zarates' cellular phone, Caracena-Zarates was surveilled being at the subject premises while he discussed being in the shower and looking for keys in his room which has led agents to determine that he resides at least part-time at the subject premises. Caracena-Zarates is believed to utilize multiple residences and vehicles to change up his travel patterns and conceal his location from law enforcement detection.

21. On August 27, 2024, at approximately 5:47pm, the following relevant conversation between Caracena-Zarates and Ladd was intercepted via the court-authorized wiretap:

ZARATES: Hello. What's up?

LADD: What's up buddy? Are you coming by the [unintelligible] house any time soon?

ZARATES: Yeah, why?

LADD: I need some.

ZARATES: Aight, I got you. Aight.

In my knowledge of the investigation, I believe the "house" was a reference to the subject premises where Ladd resides and Caracena-Zarates resides part-time. Approximately thirty minutes later, Ladd called Caracena-Zarates asking for an update on his arrival and stated that he had a "dude from Clarksville wanting to get some." Caracena-Zarates told him that he was on the

way, and Ladd replied, "Yeah, he's wanting a ball and, fuckin, I guess Derek's got some sold for me too out in Oklahoma. They're wantin a ball." Caracena-Zarates then replied, "Alright, I'm on my way." In my training, experience, and knowledge of this investigation, I believe that this conversation demonstrates that Ladd is a criminal associate who was asking to be supplied with drugs by Caracena-Zarates at the subject premises of 3519 N 27th St, Fort Smith, Arkansas. The request for a "ball" is in my training and experience, believed to a coded reference to methamphetamine.

22.     Based upon the intercepted communications from Caracena-Zarates coupled with surveillance and the recent distribution of fentanyl, your Affiant the affiant has identified 3519 N 27th St, Fort Smith, Arkansas as a residence used by Caracena-Zarates in furtherance of drug trafficking.

## ITEMS TO BE SEIZED

23.     Based on the foregoing, I respectfully submit that there is probable cause to believe that the items listed in Attachment B, which constitute evidence of violations of the Subject Offenses, will be found at the Subject Premises.

## AUTHORIZATION REQUEST

24.     For all of the reasons described above, there is probable cause to believe that fruits, evidence, and instrumentalities of violations of Title 21, United States Code, Sections 841(a)(1) and 846, the Subject Offenses, that is, possession with intent and distribution of controlled substances and conspiracy to distribute controlled substances; as described in Attachment B of this affidavit, will be found in a search of the Subject Premises, as further described in Attachment A of this affidavit.

Respectfully submitted,

_Jerred Rankin_

Jerred B. Rankin
Drug Enforcement Administration, TFO


Subscribed and sworn to before me on the **30** day of August, 2024

MARK E. FORD
UNITED STATES MAGISTRATE JUDGE
WESTERN DISTRICT OF ARKANSAS

**<u>ATTACHMENT A</u>**

**PREMISES TO BE SEARCHED**

The Subject Premises to be searched is located at 3519 North 27th Street, Fort Smith, Arkansas, 72904. The Subject Premises is a one-story single-family residence with yellow siding and white trim on the house. The house numbers are attached to the porch with "3519" perpendicular and visible from the road.  The front door is white in color. The Subject Premises faces east and is the sixth residence on the west side of 27th Street from the intersection of Spradling Avenue.







**ATTACHMENT B**
**PARTICULAR ITEMS TO BE SEIZED**

The items to be seized are fruits, evidence, and instrumentalities of violations of Title 21, United States Code, Sections 841(a)(1) and 846. Specifically, the following items are to be seized: articles of personal property tending to establish and document possession and/or distribution of controlled substances; or a conspiracy to do such; as well as documents related to financial transactions involving the proceeds of drug trafficking, including but not limited to the following:

1. Any and all controlled substances and related paraphernalia, including, but not limited to: fentanyl, and objects and containers used to package, weigh, and distribute controlled substances, such as baggies, scales, and any other material used in the manufacturing, distribution, concealment, sale, use and/or transport of a controlled substance.

2. Equipment, books, records, receipts, notes, ledgers, and other documents relating to the transportation, ordering, purchase, and distribution of controlled substances.

3. Books, records, receipts, notes, bank statements and other bank records, money drafts, letters of credit, money orders, bank checks, safe deposit records, safe deposit box keys and records, rental agreements, and items evidencing and other items evidencing the obtaining, secreting, transfer, concealment, and/or expenditure of money or assets in violation of 21 U.S.C. §§ 841(a)(1) and 846.

4. Addresses or telephone books and papers, and cell phones and the contents thereof, reflecting names, addresses or telephone numbers of co-conspirators.

5.  Income tax returns, W-2 and W-4 forms, receipts, and other documents pertaining to the filing of personal and business tax returns.

6.  United States currency and other financial instruments in amounts indicative of the proceeds of illegal drug trafficking.

7.  Indicia of occupancy, residency, and/or ownership of real property including but not limited to utility and telephone bills, mortgage payment receipts and keys.

8.  Papers, tickets, notes, schedules, receipts, and other items relating to domestic, international, and interstate travel.

9.  Photographs, and/or video tape reproductions of co-conspirators, assets, or controlled substances.

10. Cellular telephones, personal and business calendars, address and/or telephone books, rolodex indices, pager or cellular telephone memory, and papers reflecting names, addresses, telephone numbers, pager numbers, fax numbers, telex numbers, correspondences of the subjects of the investigation, and their criminal associates, sources of supply, customers, and financial institutions.

11. Firearms, counter-surveillance equipment, and weapons of any sort used to protect illegal controlled substance and/or proceeds from the sale of illegal controlled substances.

As used above, the terms "records," "documents," and "materials" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.